IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No: 4:21CR3139 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| ANNA IDIGIMA, | ) | |
| | ) | Videoconference |
| Defendant. | ) | February 14, 2023 |

TRANSCRIPT OF PLEA PROCEEDINGS
BEFORE THE HONORABLE CHERYL R. ZWART
UNITED STATES MAGISTRATE JUDGE

A-P-P-E-A-R-A-N-C-E-S

FOR THE PLAINTIFF:      Ms. Sara E. Fullerton
                        Mr. John J. Schoettle
                        Assistant United States Attorneys
                        100 Centennial Mall North
                        Suite 487, Federal Building
                        Lincoln, NE 68508-3865

FOR THE DEFENDANT:      Mr. Jerry M. Hug
                        Hug, Jacobs Law Firm
                        209 South 19th Street
                        Suite 323
                        Omaha, NE 68102

TRANSCRIBER:            Mary E. Kinnison
                        1171 N 17th Ave
                        Blair, NE 68008
                        (402) 427-3080

Proceedings recorded by electronic sound recording,
transcript produced with computer.

1          (At 2:39 p.m. on February 14, 2023; with counsel and

2     the defendant present via videoconference:)

3               COURTROOM DEPUTY:  We're on the record.

4               THE COURT:  We're on the record in Case Number

5     4:21CR3139.  This is the United States of America versus

6     Anna Idigima.

7          Counsel, please enter your appearance.

8               MS. FULLERTON:  Your Honor, I'm Assistant United

9     States Attorney Sara Fullerton, representing the government.

10              MR. SCHOETTLE:  And Your Honor, John Schoettle on

11     behalf of the government as well.

12              THE COURT:  All right.  Ms. Idigima, you are here

13     today because I've been told that you want to enter a plea

14     of guilty.

15          Is that true?

16              THE DEFENDANT:  Yes.

17              THE COURT:  I need to explain to you that I am not

18     your sentencing judge and I'm not the judge who will

19     determine whether your guilty plea is accepted and whether

20     your plea agreement is accepted.  Those matters will be

21     taken up by Judge Gerrard who is your sentencing judge, but

22     what I can do for you today is gather some information from

23     you and make a recommendation to Judge Gerrard on those

24     issues.

25          Do you agree to proceed before me?

1          THE DEFENDANT:  Yes.

2          (Defendant sworn.)

3          THE COURT:  You are now under oath.  You've sworn

4     to tell the truth which means if you lie during this

5     proceeding, you can be separately prosecuted for the crime

6     of perjury.

7          Do you understand?

8          THE DEFENDANT:  Yes.

9          THE COURT:  At this time, I'm going to have the

10     government explain to you again the charge to which you

11     intend to plead guilty and the possible penalty for that

12     charge.

13          Ms. Fullerton.

14          MS. FULLERTON:  Yes, Your Honor.

15          Ms. Idigima, Count I of the Superseding Indictment

16     alleges in substance as follows:  Beginning on or about

17     June 1st, 2021, and continuing to on or about

18     September 23rd, 2021, in the District of Nebraska, you were

19     involved in a conspiracy to distribute and possess with the

20     intent to distribute 5 kilograms of more of a mixture or

21     substance containing a detectable amount of cocaine, a

22     Schedule II controlled substance; 400 grams or more of a

23     mixture or substance containing a detectable amount of

24     fentanyl, a Schedule II controlled substance; and 50

25     kilograms or more of a detectable amount of marijuana, a

1    Schedule I controlled substance, which resulted in serious

2    bodily injury to the following persons:  A.M., B.M., and

3    I.B., in violation of Title 21, United States Code, Section

4    846.

5         Do you understand what you're charged with?

6              THE DEFENDANT:  Yes.

7              MS. FULLERTON:  The possible penalty for that

8    charge is a term of imprisonment of not less than 20 years

9    nor more than life imprisonment and a fine of up to

10   $10 million.

11        Following any term of imprisonment, there will be a

12   term of supervised release of not less than five years nor

13   more than life, and there is also a $100 special assessment.

14        Do you understand the possible penalties?

15             THE DEFENDANT:  Yes, I do.

16             THE COURT:  Having heard the charges and the

17   possible penalties, is it still your intent to plead guilty?

18             THE DEFENDANT:  Yes, ma'am.

19             THE COURT:  I have in front of me a petition to

20   enter a plea of guilty and a plea agreement, both of which

21   appear to have been signed by you.

22        Did you go over these documents with your lawyer?

23             THE DEFENDANT:  Yes, ma'am.

24             THE COURT:  Going to the petition, the document

25   with all of the questions and answers in it, did you answer

1        each of those questions truthfully?

2                    THE DEFENDANT:  Yes, ma'am.

3                    THE COURT:  Were your answers recorded correctly?

4                    THE DEFENDANT:  Yes, ma'am

5                    THE COURT:  And after going through the document,

6        did you sign it?

7                    THE DEFENDANT:  Yes, ma'am.

8                    THE COURT:  Going to the plea agreement, did you

9        read it?

10                   THE DEFENDANT:  Yes, I did.

11                   THE COURT:  Did your attorney explain it to you?

12                   THE DEFENDANT:  Yes, he did.

13                   THE COURT:  Were there any questions about its

14       meaning that he was unable to answer?

15                   THE DEFENDANT:  No, ma'am.

16                   THE COURT:  And after going through the document,

17       did you sign it?

18                   THE DEFENDANT:  Yes, I did.

19                   THE COURT:  When you went over these documents,

20       were you under the influence of drugs or alcohol or having

21       any difficulty thinking?

22                   THE DEFENDANT:  No, ma'am.

23                   THE COURT:  Are you under the influence of

24       anything right now?

25                   THE DEFENDANT:  No, ma'am.

1          THE COURT:  Are you having any difficulty hearing,

2     understanding, and answering my questions?

3          THE DEFENDANT:  No, ma'am.

4          THE COURT:  Has anybody threatened you in any way

5     to get you to plead guilty?

6          THE DEFENDANT:  No, ma'am.

7          THE COURT:  Has anybody promised you anything

8     other than the promises in the plea agreement to get you to

9     plead guilty?

10          THE DEFENDANT:  No, ma'am.

11          THE COURT:  Do you understand that if the Court

12     accepts your plea of guilty, you will be found guilty of a

13     felony?

14          THE DEFENDANT:  Yes, ma'am.

15          THE COURT:  Do you understand you have the right

16     to plead not guilty and make the government try to prove

17     this case at trial?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  Do you understand you are giving up

20     your trial rights by pleading guilty?

21          THE DEFENDANT:  Yes, ma'am.

22          THE COURT:  You've been represented in this case

23     by Mr. Hug; is that correct?

24          THE DEFENDANT:  Correct.

25          THE COURT:  Do you believe that he has

1    investigated this case sufficiently so that you know what to

2    do today?

3         THE DEFENDANT:  Yes, ma'am.

4         THE COURT:  Are you satisfied with his

5    representation?

6         THE DEFENDANT:  Absolutely.

7         THE COURT:  Do you understand that if you chose to

8    go to trial, you would have the right to counsel

9    representation at the trial at no cost to you?

10        THE DEFENDANT:  Yes.

11        THE COURT:  Do you understand you would have a

12   jury trial?

13        THE DEFENDANT:  Yes.

14        THE COURT:  Do you understand that at that trial,

15   you would have the right to see and hear the witnesses who

16   testify against you and to have them cross-examined on your

17   behalf?

18        THE DEFENDANT:  Yes, ma'am.

19        THE COURT:  Do you understand you would have the

20   right to call witnesses for you and if they would not come

21   voluntarily, you could get a court order called a subpoena

22   to make them come and testify?

23        THE DEFENDANT:  Yes, ma'am.

24        THE COURT:  Do you understand that if you chose to

25   go to trial, you could testify yourself if you wanted to or

1    you could stay silent?

2            THE DEFENDANT:  Yes, ma'am.

3            THE COURT:  Do you understand that if you stayed

4    silent at the trial, the jury would not be allowed to

5    consider that silence in deciding whether you are guilty?

6            THE DEFENDANT:  Yes, ma'am.

7            THE COURT:  And do you understand that if you

8    chose to go to trial, the government would not get a

9    conviction against you unless it was able to prove to every

10   single juror that you are guilty beyond a reasonable doubt?

11           THE DEFENDANT:  Yes, ma'am.

12           THE COURT:  Are you willing to give up all of

13   those trial rights and plead guilty in this case instead?

14           THE DEFENDANT:  Yes, I am.

15           THE COURT:  With a guilty plea, you will have a

16   felony record, and with that felony record comes the loss of

17   civil rights.  Those rights include the right to vote, the

18   right to serve on a jury, the right to hold a public office,

19   the right to carry a weapon.

20       You could also lose federal benefits, but you will lose

21   rights.

22       Do you understand?

23           THE DEFENDANT:  Yes, I do.

24           THE COURT:  And knowing that you will lose civil

25   rights, are you willing to plead guilty?

1   THE DEFENDANT: Yes, I am.

2   THE COURT: You are looking at a sentence in this

3   case of a minimum of 20 years and up to life in prison, a

4   possible fine of up to $10 million could be imposed in

5   addition to any term of imprisonment, supervised release of

6   at least five years up to a lifetime, and a $100 mandatory

7   special assessment.

8   Is that your understanding of what you're facing?

9   THE DEFENDANT: Yes, ma'am.

10   THE COURT: Has Mr. Hug explained the sentencing

11   guidelines to you?

12   THE DEFENDANT: Yes, he has.

13   THE COURT: Has he explained that those guidelines

14   provide the starting point that Judge Gerrard will look at

15   in determining what your sentence ought to be?

16   THE DEFENDANT: Yes, ma'am.

17   THE COURT: Do you understand that Judge Gerrard

18   will consider all of your relevant conduct when determining

19   your sentence?

20   THE DEFENDANT: Yes.

21   THE COURT: For example, he's going to consider

22   such things as the number of victims that were involved in

23   this case, the extent of their injuries, the facts

24   underlying any other allegations that have been set forth in

25   the Indictment [*sic*] against you, any criminal history you

1    may have, the types of crimes reflected in that history,

2    whether you were in a position of trust at the time when

3    this occurred, those types of things.

4        Do you understand that?

5            THE DEFENDANT:  Yes, ma'am.

6            THE COURT:  And once Judge Gerrard considers all

7    of your relevant conduct and makes his findings, do you

8    understand that he can sentence you within the guidelines

9    you discussed with your attorney, but he does not have to?

10    He could go above or below those guidelines based upon his

11    determination.

12        Do you understand?

13            THE DEFENDANT:  Yes, I do.

14            THE COURT:  And once Judge Gerrard determines how

15    much time you will spend in prison, do you understand you

16    will be required to serve all of that time, and the most you

17    can get off of that sentence is 54 days per year for good

18    time served, and that's only if you earn good time?

19        Do you understand?

20            THE DEFENDANT:  Yes, I do.

21            THE COURT:  Now, after you serve your time in

22    prison, your sentence will not be over.  You will be placed

23    on what is called supervised release for at least five years

24    and perhaps for the rest of your life.  I need to make sure

25    you understand what that is.

1      At the time of sentencing, Judge Gerrard is going to

2      include in your sentencing order a list of rules called

3      conditions of release that you must follow -- excuse me --

4      after you get out of prison for a minimum of five years and

5      perhaps for the rest of your life.

6          Do you understand that?

7              THE DEFENDANT:  Yes, ma'am.

8              THE COURT:  Do you understand that you will be

9      under the supervision of the Court's probation office while

10     subject to those conditions, and if you violate them, you

11     can go back to jail?

12             THE DEFENDANT:  Yes.

13             THE COURT:  And do you understand that if you

14     violate the conditions of release by committing another

15     crime, your penalty or sentence on the new crime could be

16     greater than it otherwise would have been merely because you

17     were still serving a sentence in this case when you

18     committed yet another crime?

19         Do you understand?

20             THE DEFENDANT:  Yes.

21             THE COURT:  You will be required to pay the $100

22     mandatory special assessment.

23         Were you aware of that?

24             THE DEFENDANT:  Yes, I was.

25             THE COURT:  Is there restitution in this case,

1    Ms. Fullerton?

2                 MS. FULLERTON:  Sorry, Judge.  No, Your Honor.

3                 THE COURT:  All right.  Ms. Idigima, you have a

4    plea agreement which outlines your agreement regarding what

5    should happen at the time of sentencing.  Do you understand

6    that this agreement is between you and the government and is

7    not binding on Judge Gerrard?

8                 THE DEFENDANT:  Yes.

9                 THE COURT:  At this time, I'm going to have the

10   government explain the plea agreement to you.  Please listen

11   as Ms. Fullerton does that.

12       Ms. Fullerton.

13                MS. FULLERTON:  Yes, Your Honor.

14       In substance, the plea agreement is for Ms. Idigima to

15   plead guilty to Count I of the Superseding Indictment.  In

16   exchange for that plea, the government agrees to move to

17   dismiss Counts II and III of the Superseding Indictment and

18   the original Indictment at the time of sentencing.

19       The government agrees the defendant will not be

20   federally prosecuted in the District of Nebraska for any

21   drug-trafficking crimes, including drug-trafficking crimes

22   related to overdoses caused by the distribution of cocaine

23   and/or fentanyl which may have resulted in serious injuries

24   or death as disclosed by the discovery materials delivered

25   to Defendant's attorney other than the charges set out in

1    the Superseding Indictment.

2        This agreement not to prosecute her for specific crimes

3    does not prevent any prosecuting authority from prosecuting

4    her for any other crime.

5        The plea agreement is limited to the U.S. Attorney's

6    Office for the District of Nebraska and cannot bind any

7    other federal, state, or local prosecuting, administrative,

8    or regulatory authorities.

9        The parties agree that Ms. Idigima should be held

10   responsible beyond a reasonable doubt for at least

11   10,000 kilograms but less than 30,000 kilograms of converted

12   drug weight.

13       The parties agree that her base offense level should be

14   38 because serious bodily injury resulted from the use of

15   the substances under the guidelines.

16       The parties agree that Ms. Idigima's off- -- offense

17   level should be increased by two levels because she abused a

18   position of public or private trust or used a special skill

19   in a manner that significantly facilitated the commission or

20   concealment of the offense.

21       If she is otherwise fol- -- found to qualify for

22   acceptance of responsibility, the government will move that

23   she get the full three-level reduction for acceptance, and

24   the parties agree that she does not meet the criteria for a

25   safety valve reduction.

1    The parties agree that she may request or recommend

2    additional downward adjustments or departures and that the

3    government will oppose any such requests not otherwise

4    covered in the plea agreement.

5    The parties have no agreement concerning her criminal

6    history category, except that if she were to be determined

7    to be a career offender, the parties agree her criminal

8    history category would be VI.

9    Ms. Idigima hereby knowingly and expressly waives any

10   and all rights to appeal her conviction and sentence except

11   for a claim of ineffective assistance of counsel and the

12   right to file a motion under Section 3582(c)(1)(A) for

13   compassionate release.

14   Defendant also knowingly and expressly waives any and

15   all rights to contest her conviction and sentence in any

16   post-conviction proceedings, including proceedings under

17   28 U.S. Code Section 2255, except the right to timely

18   challenge her conviction and sentence if the Eighth Circuit

19   Court of Appeals or the U.S. Supreme Court later find the

20   charge to which she has agreed to plead guilty fails to

21   state a crime, and the right to seek post-conviction relief

22   based on ineffective assistance of counsel.

23   That, in substance, is the plea agreement.

24        THE COURT:  Mr. Hug, do you agree?

25        MR. HUG:  I agree, Your Honor, yes.

1          THE COURT:  All right.  Ms. Idigima, did you

2     listen as the government described the plea agreement?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Did that description match your

5     understanding of your agreement with the government?

6          THE DEFENDANT:  Yes, it does.

7          THE COURT:  Under the terms of the plea agreement,

8     you're giving up your right to appeal and to collateral

9     attack with certain exceptions, and I need to make sure you

10    understand what you're giving up.

11         Everything that's done by this court is subject to

12    being looked at by another court to make sure it was done

13    right.  The process is called an appeal, and the court that

14    looks at it is the Eighth Circuit Court of Appeals.

15         Do you understand?

16         THE DEFENDANT:  Yes.

17         THE COURT:  Under the terms of this plea

18    agreement, you're giving up your right to that appeal

19    process with two exceptions.

20         You can claim that you had ineffective assistance of

21    counsel or you can request compassionate release and appeal

22    the denial of any such request.  But in any other

23    circumstances, you're giving up your right to appeal.

24         Do you understand that?

25         THE DEFENDANT:  Yes, I do.

1          THE COURT:  Do you under- --  Collateral attack is

2     different than an appeal.  It arises after all of the appeal

3     process is over, and it allows you to challenge your

4     conviction and your sentence by claiming your constitutional

5     rights were violated.

6          Do you understand?

7               THE DEFENDANT:  Yes.

8          THE COURT:  Under the terms of this plea

9     agreement, you're giving up your right to that type of

10    proceeding as well, again, with two exceptions.

11         You can claim that you had ineffective assistance of

12    counsel or you can claim that what you're admitting to here

13    today is not a crime.  But in all other respects, you're

14    giving up your right to collateral attack.

15         Do you understand that?

16              THE DEFENDANT:  Yes, ma'am.

17         THE COURT:  Do you understand that your waiver of

18    appeal and your waiver of collateral attack apply both to

19    your conviction and to the sentence you have not yet

20    received?

21              THE DEFENDANT:  Yes, ma'am.

22         THE COURT:  Have you talked to Mr. Hug about your

23    appeal rights and your collateral attack rights?

24              THE DEFENDANT:  Yes.

25         THE COURT:  After having those discussions and

1    considering your options, have you decided to give up your

2    right to appeal and to collateral attack with the exceptions

3    listed in the plea agreement?

4              THE DEFENDANT:  Yes, ma'am.

5              THE COURT:  Has anybody made any promises to you

6    that are not in the written plea agreement?

7              THE DEFENDANT:  No, ma'am.

8              THE COURT:  Do you understand there is no

9    guarantee your sentence will be less because you pled guilty

10   instead of being found guilty by a jury?

11             THE DEFENDANT:  Yes, ma'am.

12             THE COURT:  At this time, I'm going to have the

13   government explain the key facts the government would

14   present at trial if this case went to trial.  Please listen

15   as Ms. Fullerton does that.

16      Ms. Fullerton.

17             MS. FULLERTON:  Yes, Your Honor.  If this matter

18   were to go to trial, the government believes the following

19   information would go before the jury.

20      Beginning in about June of 2021, Ms. Idigima was an

21   employee of the Nebraska State Patrol stored evidence room

22   in Lincoln, and she began stealing drugs that were being

23   held in completed State Patrol cases which were awaiting

24   destruction orders.

25      She was providing those drugs to her boyfriend and

1    co-defendant, George Weaver, who was then selling them in
2    Lincoln.
3         Video surveillance from the State Patrol evidence
4    storage facility shows Ms. Idigima opening sealed boxes,
5    taking items from those boxes, putting them in garbage bags,
6    and loading those bags into her personal vehicle on several
7    occasions between June 16th of 2021 and August 12th of 2021.
8         The Lincoln/Lancaster County Narcotics Task Force
9    conducted an audit of the State Patrol evidence storage
10   areas where Ms. Idigima had access, and the following
11   approximate totals of drugs, among others, were found to be
12   missing:  154 pounds of marijuana, 19 pounds of cocaine, and
13   6 pounds of fentanyl.
14        In August of 2021, investigators searched co-defendant
15   Weaver's Snapchat account and found drug-related
16   conversations and a photo of several large bags of marijuana
17   on a bed.  One of those bags had a piece of red evidence
18   label tape on it, which was consistent with evidence tape
19   used by the State Patrol.
20        In a search of an apartment that was rented by Weaver,
21   investigators found residue containing cocaine, fentanyl,
22   and marijuana.
23        On August 4th of 2021, a Nebraska City couple, who will
24   be A.M. and B.M., both overdosed at their home.  One of them
25   required CPR, both were given Narcan, and they both had to

1    be transported to hospitals in Omaha.

2    During a search of their residence, two bags of white

3    powder containing cocaine and fentanyl weighing a total of

4    just under an ounce were found.

5    Dr. Stacey Hail [phonetic], who is a physician who is

6    board certified in emergency medicine and med- -- medical

7    toxicology, reviewed first responder and hospital records

8    for A.M. and B.M., and Dr. Hail determined that their use of

9    cocaine laced with fentanyl carried a substantial risk of

10   death had they not been given Narcan.

11   After they recovered, both A.M. and B.M. told

12   investigators they bought what they thought was an ounce of

13   cocaine in Lincoln from a person who will be Witness 1.

14   B.M. engaged in a recorded phone call monitored by the

15   State Patrol with Witness 1.  Witness 1 apologized for

16   selling them bad cocaine, admitted it must have had fentanyl

17   in it.

18   Witness 1 was then contacted by law enforcement,

19   admitted selling the cocaine to A.M. and B.M., and said he

20   bought the ounce of cocaine from George Weaver over the

21   course of two purchases in late July and early August of

22   2021.

23   Witness 1 has an agreement to cooperate with -- with

24   the federal government.

25   On August 18th of 2021, I.B. was found unresponsive

1  between two trailers in Lincoln.  He was given CPR and

2  Narcan and was hospitalized.

3  A search of his car turned up a baggie containing about

4  2 grams of white substance, and another 2 grams of a similar

5  substance were found folded up in some paper in his wallet.

6  Both those items were found to contain cocaine and fentanyl.

7  Dr. Hail reviewed reports and medical records for this

8  incident and determined I.B. would have been at a

9  substantial risk of death had he not been given Narcan.

10  I.B. later told investigators he bought what he thought

11  was cocaine earlier the day of his overdose from a person

12  who will be Witness 2, and had used some of that substance

13  in his car just prior to his overdose.

14  Witness 2 has a federal cooperation agreement.  He was

15  arrested on August 20, 2021, with approximately 1 ounce of

16  cocaine and fentanyl.  He said it was some of the "bad

17  stuff" which was causing overdoses and said he got it from

18  Weaver one to two weeks prior.

19  After his arrest, Witness 2 worked with investigators

20  and met with Weaver and had a recorded conversation about

21  paying Weaver for drugs that the witness had previously

22  purchased from him, including the cocaine which caused

23  I.B.'s overdose.

24  This particular recorded conversation took place at

25  Ms. Idigima's residence.

Witness 3 also has a federal agreement. He started obtaining cocaine from Weaver in about June of 2021. On one occasion he met with Weaver who had a white female in his van. Weaver referred to the female as his plug.

Witness 3 said he did not see that female again until he saw Ms. Idigima's photo in the newspaper after she and Weaver were arrested.

Witness 3 also visited the apartment rented by Weaver where the witness saw about 20 plastic bags, each containing a pound of marijuana, along with compressed sheets of THC and THC concentrates.

In the middle of July of 2021, Weaver showed the witness three large gray evidence bags containing a white dust which Weaver said was cocaine, but the witness did not believe him based on appearance and taste.

Witness 4 has a non-prosecution agreement. In July of 2021, she bought 50 ecstacy pills from Mr. Weaver and Ms. Idigima together. Weaver told the witness that Idigima worked for a law enforcement agency, and the witness said she paid for the pills by sending money to Idigima's Cash App account.

Witness 5 has a federal agreement. In August or September of 2021, she arranged to trade 4 ounces of methamphetamine to Weaver in exchange for 500 what were labeled M30 pills.

1       She said Weaver arrived at the location of the

2   transaction with Idigima, and Idigima was the one who pulled

3   the bag of pills out of her purse.

4       In January of 2023, Ms. Idigima wrote a letter, which

5   she intended to be sent from the Saline County jail where

6   she was housed, to an inmate at another correctional

7   facility.

8       In that letter, she identified herself as "Anna

9   Idigima" and wrote, "You may have heard about the case.  I

10  was the evidence tech from the Nebraska State Patrol who

11  took 1.2 million in drugs and sold them."

12      This all occurred in Nebraska.

13          THE COURT:  Mr. Hug, do you agree if this case

14  went to trial, that evidence would go before a jury?

15          MR. HUG:  Yes, Your Honor.

16          THE COURT:  Ms. Idigima, did you listen as the

17  government described the evidence against you?

18          THE DEFENDANT:  Yes, ma'am.

19          THE COURT:  Is all of that true?

20          THE DEFENDANT:  Yes, ma'am.

21          THE COURT:  Between June 1st of 2021 and

22  September 23rd of 2021, were you in Nebraska?

23          THE DEFENDANT:  I went to Florida at one -- at one

24  point.  I can't remember when, but it was --

25          THE COURT:  Well...

1          THE DEFENDANT:  -- during that time.

2          THE COURT:  Were you working for the Nebraska

3     State Patrol during that period of time?

4          THE DEFENDANT:  Yes, ma'am.

5          THE COURT:  With the exception of the -- I assume

6     you're talking about like a vacation to Florida, were you in

7     Nebraska?

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  Did you know Mr. George Lesley

10    Weaver Jr.?

11         THE DEFENDANT:  Yes, I do.

12         THE COURT:  Did you and he distribute drugs

13    together?

14         THE DEFENDANT:  Yes, we did.

15         THE COURT:  Did you provide the drugs by using

16    your access to drugs from the Nebraska State Patrol and

17    providing them to Weaver or directly selling them yourself?

18         THE DEFENDANT:  Yes, ma'am.

19         THE COURT:  Over the period of time where you were

20    doing this, did you distribute and possess with the intent

21    to distribute 5 kilograms or more of a mixture or substance

22    containing a detectable amount of cocaine?

23         THE DEFENDANT:  Yes, ma'am.

24         THE COURT:  Did you also distribute and possess

25    with the intent to distribute 400 grams or more of a mixture

1    or substance containing a detectable amount of fentanyl?

2            THE DEFENDANT:  Yes, ma'am.

3            THE COURT:  And during that same period of time,

4    did you distribute and possess with the intent to distribute

5    50 kilograms or more of a detectable amount of marijuana?

6            THE DEFENDANT:  Yes, ma'am.

7            THE COURT:  With respect to the fentanyl, were --

8    was some of the fentanyl -- or some of the cocaine that you

9    distributed along with Mr. Weaver laced with fentanyl?

10           THE DEFENDANT:  I believe so, yes.

11           THE COURT:  Did the drugs that you sold, either

12   directly or through Mr. Weaver, result in serious bodily

13   injury to persons who initials are A.M., B.M., and I.B.?

14           THE DEFENDANT:  Yes, ma'am.

15           THE COURT:  Any additional questions,

16   Ms. Fullerton?

17           MS. FULLERTON:  No, Your Honor.

18           THE COURT:  Mr. Hug?

19           MR. HUG:  No, Your Honor.

20           THE COURT:  Ms. Fullerton, do you believe the

21   guilty plea is knowing, intelligent, and voluntary, and that

22   there is a factual basis for it?

23           MS. FULLERTON:  Yes, Your Honor.

24           THE COURT:  Mr. Hug, do you agree?

25           MR. HUG:  I do agree.

1          THE COURT:  Ms. Idigima, do you want the Court to

2     accept your plea of guilty?

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  Do you have any questions of me before

5     I proceed?

6          THE DEFENDANT:  No, ma'am.

7          THE COURT:  To Count I of the Superseding

8     Indictment, which alleges that beginning on or about

9     June 1st of 2021 and continuing until September 23rd of

10    2021, while in the District of Nebraska, you, along with

11    George Lesley Weaver, Jr., did knowingly and intentionally

12    combine, conspire, confederate, and agree together to

13    distribute and possess with the intent to distribute

14    5 kilograms or more of a mixture or substance containing a

15    detectable amount of cocaine, 400 grams or more of a mixture

16    or substance containing a detectable amount of fentanyl, and

17    50 kilograms or more of a detectable amount of marijuana

18    resulting in serious bodily injury to three people, initials

19    of which are A.M., B.M., and I.B., what do you plead?

20         THE DEFENDANT:  Guilty.

21         THE COURT:  I do find that your guilty plea is

22    knowing, intelligent, and voluntary, and that there is a

23    factual basis for it.  I will recommend to Judge Gerrard

24    that he accept your plea agreement and your plea.

25         We're looking at a sentencing date of May 15th at 1:30.

1    Does that work for everyone?

2          MS. FULLERTON:  Judge, I will probably be out of

3    town that week.

4          THE COURT:  Okay.  See what else we've got.  Could

5    we go with May 25th at 2:30?

6          MS. FULLERTON:  That works for me.

7          MR. HUG:  That works for me, Your Honor.

8          THE COURT:  All right.  Is there anything else

9    that we need to take up at this time?

10         MS. FULLERTON:  No, Your Honor.

11         MR. HUG:  Not on behalf of the defendant,

12    Your Honor.

13         THE COURT:  All right.  We are in recess.

14     (Recess taken at 3:08 p.m.)

15

16                 *******

17

18     I, Mary E. Kinnison, certify that the foregoing is a

19    correct transcription to the best of my ability from the

20    digital recording of the proceedings held in the

21    above-entitled matter.

22

23     /s/Mary E. Kinnison       March 4, 2023
            Transcriber              Date

24

25